FOX, Justice.
[¶1] Judge Ruth Neely objects to the Wyoming Commission on Judicial Conduct and Ethics’ (Commission) recommendation that she be removed from her positions as municipal court judge and part-time circuit court magistrate because of her refusal to perform same-sex marriages in her judicial capacity as a part-time circuit court magistrate. We conclude, as have all the state judicial ethics commissions that have considered this question, that a judge who will perform marriages only for opposite-sex couples violates the Code of Judicial Conduct, and we hold that Judge Neely violated Rules 1.2, 2.2, and 2.3 of the Wyoming Code of Judicial Conduct. However, we do not accept the Commission’s recommendation for removal, and instead order public censure, with specific conditions.

ISSUES

[¶2] While the parties state numerous and divergent issues, we consider the issues in this case to be:
1. Does the United States Constitution permit this Court to discipline Judge Neely for announcing that her religious beliefs prevent her from officiating same-sex marriages?
2. Does the Wyoming Constitution permit this Court to discipline Judge Neely for announcing that her religious beliefs prevent her from officiating same-sex marriages?
3. Are the provisions of the Wyoming Code of Judicial Conduct alleged to have been violated by Judge Neely void for vagueness?
4. Did Judge Neely violate the Wyoming Code of Judicial Conduct?
[¶3] This case is not about same-sex marriage or the reasonableness of religious beliefs. We recognize that “[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here.” Obergefell v. Hodges, — U.S. —, 135 S.Ct. 2584, 2602, 192 L.Ed.2d 609 (2015). This case is also not about imposing a religious test on judges. Rather, it is about maintaining the public’s faith in an independent and impartial judiciary that conducts its judicial functions according to the rule of law, independent of outside influences, including religion, and without regard to whether a law is popular or unpopular.

*733
FACTS

[¶4] Judge Neely was appointed as a municipal court judge for the Town of Pinedale, Wyoming, in 1994, and has served continuously in that capacity ever since.[1] As a Pine-dale municipal court judge, Judge Neely hears all cases arising from the town’s ordinances, such as traffic and parking violations, animal control, public intoxication, underage drinking, breach of peace, nuisances, and similar matters. Municipal court judges are not authorized to perform marriages. Wyo. Stat. Ann. § 20-l-106(a) (LexisNexis 2015). Municipal court judges are appointed by the governing bodies of the towns where they sit. Wyo. Stat. Ann. § 15-4-202(d) (LexisNexis 2015). It is undisputed that the Wyoming Code of Judicial Conduct applies to them, and that they are subject to the disciplinary authority of the Commission on Judicial Conduct and Ethics and this Court. Wyoming Code of Judicial Conduct, Application I.(B); see also Wyo. Const, art. 5, § 6. The evidence is uncontroverted that Judge Neely is highly respected as a municipal court judge in her community, including by at least one member of the gay community.
[¶5] Since approximately 2001, Judge Neely has also served as a part-time circuit court magistrate; she was most recently appointed by circuit court Judge Haws to assist him. Part-time magistrates are in a unique position in that they perform judicial functions only as needed. They are not on the state payroll, but instead are compensated for particular services by voucher. Wyo. Stat. Ann, § 5-9-213 (LexisNexis 2015). One of her powers in that capacity is to perform marriage ceremonies, Wyo. Stat. Ann. § 5-9-212(a)(iii) (LexisNexis 2015), and in fact performing marriages was her primary function as a part-time circuit court magistrate. Judge Neely was compensated for marriages by the marrying couple and not by the state. Under Wyoming law, marriage is “a civil contract. ...” Wyo. Stat. Ann. § 20-1-101 (Lex-isNexis 2015). Marriage ceremonies have minimal requirements:
In the solemnization of marriage no particular form is required, except that the parties shall solemnly declare in the presence of the person performing the ceremony and at least two (2) attending witnesses that they take each other as husband and wife.
Wyo. Stat. Ann. § 20-l-106(b) (LexisNexis 2015).
[¶6] Judge Neely has performed over 100 weddings. Part-time magistrates can and do decline to perform marriages for various reasons. Stephen Smith, who also serves as a part-time circuit court magistrate, testified that he only performs marriages for people he knows. Judge Haws testified that he would turn down a request to perform a marriage if his schedule would not permit it, and that it would be acceptable for magistrates to turn down such a request if they were going to a football game, getting their hair done, or were sick.
[¶7] When she was appointed as part-time circuit court magistrate, Judge Neely took the oath required by Wyoming law.
“I do solemnly swear (or affirm) that I will support, obey and defend the constitution of the United States, and the constitution of the state of Wyoming; that I have not knowingly violated any law related to my election or appointment, or caused it to be done by others;- and that I will discharge the duties of my office with fidelity.”
Wyo. Const, art. 6, § 20.[2]
[¶8] Judge Neely is a devout Christian and a member of the Lutheran Church, Missouri Synod. It is undisputed that she holds the sincere belief that marriage is the union of one man and one woman. Shortly after the United States District Court for the District of Wyoming issued its order enjoining the state from enforcing or applying any “state law, policy, or practice, as a basis to deny marriage to same-sex -couples,” Guzzo v. Mead, No. 14-CV-200-SWS, 2014 WL 5317797, at *9 (D. Wyo. Oct. 17, 2014),[3] *734 Judge Neely met with Judge Haws “to explain to him that I would not be able to officiate same-sex marriages due to my sincerely held religious beliefs about what marriage is.” Judge Haws advised her to “keep your head down and your mouth shut,” until they received further guidance.
[¶9] On December 5, 2014, Pinedale Roundup reporter Ned Donovan called Judge Neely on her cell phone. She returned the call, Mr. Donovan answered “Pinedale Roundup,” and he then asked her if she was “excited” to be able to perform same-sex marriages. In the article that followed the interview, two quotes were attributed to Judge Neely, which she later testified were accurate:
“I will not be able to do them.... We have at least one magistrate who will do same-sex marriages, but I will not be able to.”
“When law and religion conflict, choices have to be made. I have not yet been asked to perform a same-sex marriage.”
[¶10] Mr. Donovan’s article appeared in the December 9, 2014 edition of the Pinedale Roundup. The Sublette Examiner published the article in its online edition on December 11, 2014. The matter came to the Commission’s attention, and on December 22, 2014, the Commission’s Executive Director forwarded the articles to the Commission’s Investigatory Panel for their review. On January 6, 2015, the Investigatory Panel decided to commence an investigation and sent a letter of inquiry to Judge Haws and Judge Neely.
[¶11] Also on January 6, without knowledge of the Commission’s actions, Judge Neely sent a letter to the Judicial Ethics Advisory Committee to seek its guidance. She asked: “Can a magistrate recuse himself/herself from officiating at a same sex wedding due to religious conviction; and if so, without fear of civil rights repercussions?” She explained:
Without getting in too deeply here, homosexuality is a named sin in the Bible, as are drunkenness, thievery, lying, and the like. I can no more officiate at a same sex wedding than I can buy beer for the alcoholic or aid in another person’s deceit. I cannot knowingly be complicit in another’s sin. Does that mean I cannot be impartial on the bench when that homosexual or habitual liar or thief comes before me with a speeding ticket? Or the alcoholic appears before me for yet another charge of public intoxication? No. Firmly, no. I have been the municipal court judge for the Town of Pinedale for over 20 years; and there has not been one claim of bias or prejudice made by anyone who has come before me. Not the homosexual, not the alcoholic, not the liar, not the thief. Not one.[4]
The Commission provided no answer to Judge Neely’s question, explaining that it could only “provide guidance for those judges seeking resolution to current or unresolved ethical dilemmas, rather than to confirm a judge’s decision or provide a legal opinion.” On January 15, 2015, Judge Haws met with Judge Neely and suspended her from her position as a part-time circuit court magistrate.
[¶12] In her response to the Investigatory Panel’s inquiry, Judge Neely affirmed that “[m]y conscience, formed by my religious convictions, will not allow me to solemnize the marriage of two men or two women,...” She indicated that she has not been asked to perform a same-sex marriage, and she admonished the Commission:
[Pjlease keep my and others’ First Amendment rights in mind. I want to continue to officiate at weddings; and I should not have to fear that lawful exercise of my *735 freedom of religion as a member of a Lutheran church in Pinedale, Wyoming would be a violation of the Code.
[¶13] After reviewing the responses from Judge Neely and Judge Haws, the Investigatory Panel met again and determined there was probable cause to find a code violation and referred the matter to the Commission’s Adjudicatory Panel. The Commission and Judge Neely retained counsel, and the parties engaged in discovery and filed cross-motions for summary judgment. The Adjudicatory Panel held a hearing on those motions and issued its Order Granting Commission’s Motion for Partial Summary Judgment and Denying Judge Neely’s Motion for Summary Judgment on December 31, 2015. The full Commission adopted the Adjudicatory Panel’s findings and recommendations, and recommended that Judge Neely be removed from her positions as municipal court judge and part-time circuit court magistrate.
[¶14] Judge Neely timely petitioned this Court to reject the Commission’s recommendation, the parties filed their briefs, and this Court heard the arguments of counsel. Although normally all proceedings before the Commission are confidential (Rules Governing the Commission on Judicial Conduct and Ethics, Rule 22), Judge Neely filed a motion seeking to remove the confidentiality, the motion was not opposed by the Commission, and it was granted by this Court. Several motions to file Amicus Curiae briefs were filed, and this Court denied all but the Motion for Leave to Pile Proposed Brief of Amici Curiae Mayor and Town Council Members of the Town of Pinedale and Sutherland Institute Center for Family & Society in Support of the Honorable Ruth Neely’s Petition Objecting to the Commission’s Recommendation, which was granted.

DISCUSSION

[¶15] Judge Neely contends that removing[5] her from either judicial position “because of her religious beliefs” would violate her constitutional rights to free speech and free exercise of religion, under both the United States and the Wyoming constitutions. Judge Neely’s religious beliefs, however, are not the issue. Rather, the issue is Judge Neely’s conduct as a judge.

I. Does the United States Constitution permit this Court to discipline Judge Neely for announcing that her religious beliefs prevent her from officiating same-sex marriages?

[¶16] The free exercise clause of the First Amendment provides that “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof....” U.S. Const, amend. I. This provision is made applicable to the states by the Fourteenth Amendment. Cantwell v. State of Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). “The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires.” Employment Div., Dep’t of Human Resources of Oregon v. Smith, 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990).[6] Yet the United States Supreme Court has recognized an important distinction between the “freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be.” Cantwell, 310 U.S. at 303-04, 60 S.Ct. at 903.
[¶17] In Smith, the United States Supreme Court considered the free exercise claims of two parties whose employment had been terminated for their use of peyote for religious purposes, and then were denied unemployment benefits. 494 U.S. at 874, 110 S.Ct. at 1598-99. The Court rejected respondents’ claims that “them religious motivation for using peyote places them beyond the reach of a criminal law that is not specifically directed at their religious practices....,” Id. at 878, *736 110 S.Ct, at 1599, citing the principle that a citizen cannot excuse violation of the law because of his religious beliefs. “ ‘Laws,’ we said, ‘are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.Id. at 879, 110 S.Ct. at 1600 (quoting Reynolds v. United States, 98 U.S. 145, 166-67, 25 L.Ed. 244 (1878)).
Subsequent decisions have consistently held that the light of free exercise does not relieve an individual of the obligation to comply with a ‘valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes),’
Smith, 494 U.S. at 879, 110 S.Ct. at 1600 (citations omitted).
[¶18] We adhere to the Smith Court’s rule on the interplay between the right to free exercise and the obligation to comply with a valid and neutral law, but unlike the Smith Court, we will apply strict scrutiny to our analysis. The parties agree that we should do so, and Judge Neely has raised both free exercise of religion and freedom of speech claims, requiring us to apply the strict scrutiny standard to our decision. See Republican Party of Minnesota v. White, 536 U.S. 765, 774, 122 S.Ct. 2528, 2534, 153 L.Ed.2d 694 (2002) (applying strict scrutiny in First Amendment challenge to rule restricting judicial campaign speech). Strict scrutiny requires us to determine whether disciplining Judge Neely for her refusal to conduct same-sex marriages serves a compelling state interest, and whether the discipline is. narrowly tailored to serve that interest. Williams-Yulee v. Florida Bar, — U.S. —, 135 S.Ct. 1656, 1664-65, 191 L.Ed.2d 570 (2015).
[¶19] The judicial code at issue in Williams-Yulee prohibited candidates for judicial election from “personally soliciting] campaign funds, or solicit[ing] attorneys for publicly stated support....” 135 S.Ct. at 1663 (citation omitted). Williams-Yulee (Yu-lee), who ran for a seat on a county court, drafted a campaign letter soliciting campaign contributions, which she mailed to local voters and posted on her campaign website. Id. The Florida bar filed a complaint against Yulee for violating the Florida Code of Judicial Conduct, and the Florida Supreme Court, finding that Canon- 7C was narrowly tailored to serve a compelling state interest, imposed sanctions on Yulee for her code violation. Id. at 1664.
[¶20] The Williams-Yulee Court agreed that the State of Florida had a “compelling interest in preserving public confidence in the integrity of the judiciary,...” Id. at 1666.
The importance of public confidence in the integrity of judges stems from the place of the judiciary in the government. Unlike the executive or the legislature, the judiciary “has no influence over either the sword or the purse; ... neither force nor will but merely judgment.” The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (capitalization altered). The judiciary’s authority therefore depends in large measure on the public’s willingness to respect and follow its decisions. As Justice Frankfurter once put it for the Court, “justice must satisfy the appearance of justice.” Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954).
Id. See also Caperton v. A.T. Massey Coal Co., 566 U.S. 868, 889, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009) (“Judicial integrity is ... a state interest of the highest order.” (citation omitted)). We find that, like the State of Florida, the State of Wyoming has a compelling government interest in maintaining the integrity of the judiciary, in this case by enforcing Wyoming Rules of Judicial Conduct 1.2, 2.2, and 2.3.
[¶21] Judge Neely contends that Republican Party of Minnesota v. White governs, and thex-e is no compelling state interest in ensuring her lack of preconception on the issue of same-sex marriage, 536 U.S. at 777-78, 122 S.Ct. at 2536. In White, the United States Supreme Court addressed a different rule, restricting judicial campaign activity.[7] *737 The Court there had before it the “announce clause,” which said that a candidate for judicial office in Minnesota shall not “announce his or her views on disputed legal or political issues.” Id., 536 U.S. at 770, 122 S.Ct. at 2532. (The “announce clause” is distinguished from a separate provision which “prohibits judicial candidates from making ‘pledges or promises of conduct other than the faithful and impartial performance of the duties of the office.’ ” (internal citation omitted)).
[¶22] In White, a candidate for judicial office had distributed campaign literature criticizing “Minnesota Supreme Court decisions on issues such as crime, welfare, and abortion.” Id. at 768, 122 S.Ct. at 2531. Although a complaint was filed against him, the disciplinary board with the responsibility to investigate ethical violations dismissed the complaint, expressing doubt whether the announce clause was constitutionally enforceable. Id. at 769, 122 S.Ct. at 2531. The candidate, who had nevertheless withdrawn from the race, filed suit, joined by .the Republican Party of Minnesota and others, seeking a declaration that the announce clause violated the First Amendment. The board interpreted the announce clause to allow the candidate to criticize decisions of the state supreme court on such issues as application of the exclusionary rule in criminal cases, striking down a state law restricting welfare benefits, and financing abortions for poor women, but not if the candidate also stated he was against stare decisis. Id. at 771-72, 122 S.Ct. at 2533.
[1123] The Court found that, although judicial impartiality may be a compelling state interest, the announce clause was not narrowly tailored to serve that interest. Id. at 774-76, 122 S.Ct. at 2534-35. The White majority reached this conclusion by first defining “impartiality” as “the lack of bias' for or against either party to the proceeding. Impartiality in this sense assures equal application of the law.” Id. at 775-76, 122 S.Ct. at 2535 (emphasis in original), The Court then reasoned that the announce clause failed to address the objective of judicial impartiality because it “does not restrict speech for or against particular parties, but rather speech for or against particular issues.” Id. at 776, 122 S.Ct. at 2535 (emphasis in original).
[¶24] There are two critical differences between White and Judge Neely’s ease. First, rather than simply express her views on a matter of law or religion, she has stated her position that she will not perform her judicial functions with impartiality. She does not merely believe that homosexuality is a sin; as a judge, she will manifest that belief by not treating homosexual persons the same way she treats heterosexual persons. Thus, unlike the candidate in White, Judge Neely’s conduct is at odds with a “lack of bias for or against either party....” Id. at 775, 122 S.Ct. at 2535. She refuses “equal application of the law” to homosexuals. Id. at 776, 122 S.Ct. at 2535. Second, the rules she has violated are far more well established than the announce clause at issue in White. Rule 1,2, Promoting Confidence in the Judiciary; Rule 2.2, Impartiality and Fairness; and Rule 2.3, Bias, Prejudice, and Harassment, all address different facets of the fundamental requirement that judges maintain public confidence in the judiciary by impartially applying the law. See Infra ¶¶ 59-70. The Wyoming Code of Judicial Conduct, including the three rules at issue here, is based on the American Bar Association Model Code of Judicial Conduct, as revised in 2007. Arthur Garwin et al., Annotated Model Code of Judicial Conduct, at 22, 30, 92, 111 (2d ed. 2011). Each of the rales at issue here has been applied in numerous decisions. Id. at 31-73, 93-111, 113-119.
When [a judge] takes the oath of office, he or she yields the prerogative of executing the responsibilities of the office on any *738 basis other than the fair and impartial and competent application of the law to the facts. The preservation of the rule of law as our last best hope for the just ordering of our society requires nothing less than an insistence by this Court that our justice court judges be in fact what they are in name: judges.
In re Bailey, 541 So.2d 1036, 1039 (Miss. 1989) (emphasis omitted).
[¶25] The White Court went on to look at other possible grounds for finding a compelling state interest, and it rejected the argument that avoiding preconception on a particular legal view was a compelling state interest, in part because “it is virtually impossible to find a judge who does not have preconceptions about the law.” 536 U.S. at 777, 122 S.Ct. at 2536. It similarly rejected the notion that there was a compelling state interest in maintaining judicial open-mindedness regarding the law, stating, for example, that Minnesota’s prohibition of a judicial candidate’s statement, “I think it is constitutional for the legislature to prohibit same-sex marriages,” was “woefully under-inclusive” because the same person could make that statement prior to announcing his candidacy, and after he is elected. Id. at 779-80, 122 S.Ct. at 2537. (White was decided before Obergefell.)
[¶26] Judge Neely attempts to fit her conduct into the “lack of preconception” prong discussed in White, 536 U.S. at 766,122 S.Ct. at 2530. But we are not concerned here with Judge Neely’s views on the issue of same-sex marriage. Instead, the questions that Judge Neely’s conduct engender regarding her judicial impartiality go to her bias toward particular parties, rather than toward particular issues. Judge Neely has indicated that she will perform marriage ceremonies for one category of parties, but not another. Her position is a sufficient basis for the public’s confidence in Judge Neely’s impartiality to be undermined, and thus enforcement of the Code of Judicial Conduct serves a compelling state interest under these facts. Although Judge Neely contends that this result would mean that “no one who holds Judge Neely’s widely shared beliefs about marriage can remain a judge in Wyoming,” that is incorrect. Judge Neely may hold her religious beliefs, and she must impartially apply the law regardless of those beliefs.
[¶27] It is quite likely that all judges disagree with some aspect of the law for religious, personal, or moral reasons. Yet the judiciary plays a key role in preserving the principles of justice and the rule of law, which requires the consistent application of the law regardless of the judge’s personal views. “Although each judge comes to the bench with a unique background and personal philosophy, a judge must interpret and apply the law without regard to whether the judge approves or disapproves of the law in question.” Wyoming Code of Judicial Conduct, Rule 2.2, Comment 2. “Our obligation is to define the liberty of all, not to mandate our own moral code.” Planned Parenthood of Southeastern Pennsylvania. v. Casey, 505 U.S. 833, 850, 112 S.Ct. 2791, 2806, 120 L.Ed.2d 674 (1992). An independent judiciary “requires that judges decide cases according to the law and the facts, without regard to whether” a particular law is popular, and without permitting a judge’s “other interests or relationships to influence the judge’s judicial conduct or judgment.” Wyoming Code of Judicial Conduct, Rule 2.4(B) and Comment. “No judge is permitted to substitute his concept of what the law ought to be for what the law actually is.” In re Inquiry Concerning a Judge, J.Q.C. No. 77-16, 357 So.2d 172, 179 (Fla. 1978). We find that the state has a compelling interest in maintaining public confidence in the judiciary by enforcing the rules requiring independence and impartiality.
[¶28] We turn next to the narrowly-tailored prong of strict scrutiny. The Williams-Yulee Court explained that “narrowly tailored” does not mean “perfectly tailored.”
The impossibility of perfect tailoring is especially apparent when the State’s compelling interest is as intangible as public confidence in the integrity of the judiciary.... Here, Florida has concluded that all personal solicitations by judicial candidates create a public appearance that undermines confidence in the integrity of the judiciary; banning all personal solicitations *739 by judicial candidates is narrowly tailored to address that concern.
Williams-Yulee, 135 S.Ct. at 1671.
[¶29] Judge Neely argues that “removing [her] for her religious beliefs and expression about marriage is fatally underinclusive,” and therefore not narrowly tailored. In Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the United States Supreme Court found that the challenged ordinances were not narrowly tailored because they were underinclusive to the city’s professed governmental interest in protecting the public health and preventing cruelty to animals. The ordinances, while prohibiting the Church of Lukumi’s animal sacrifice, permitted many other types of animal deaths, like euthanasia of unwanted animals. Id., 508 U.S. at 543, 113 S.Ct. at 2232. Judge Neely attempts to draw parallels to her circumstances, arguing that a municipal court judge “may critique or praise ... the Guzzo decision that brought same-sex marriage to Wyoming” or could “publicly disclose their views on controversial political issues” in a caucus-type election procedure. Judge Neely again mischaracterizes her conduct at issue. She is not subject to discipline merely because she has expressed her religious beliefs. She has gone one or two critical steps farther than that to say that she will not impartially perform her judicial functions with respect to parties the United States Supreme Court has held have a constitutional right to be treated equally. Obergefell, 135 S.Ct. at 2598, 2602 (due process clause and equal protection clauses of the Fourteenth Amendment guarantee same-sex couples the right to marry).
[¶30] Judge Neely further argues that disciplining her would violate her free speech rights because the Commission would not have brought a disciplinary proceeding against a judge who expressed her willingness to follow the law on same-sex marriage, and therefore it is discriminating against her based on the content and viewpoint of her speech. But there would indeed be no basis for disciplining a judge who indicated her willingness to follow the law and thus demonstrated her impartiality toward parties. The action against Judge Neely is a response to her deeds, not her faith.
[¶31] Judge Neely argues that others could perform marriages for same-sex couples, causing no disruption to their rights to marry, and the dissent relies heavily on the fact that same-sex couples will likely face no obstacles to getting married despite Judge Neely’s refusal to perform their marriages. These contentions may be true, but they have no relevance to the decision whether she has violated any provision of the Code of Judicial Conduct. Even if we accepted &e premise that allowing Judge Neely to opt out would have no effect on the rights of same-sex couples to marry,[8] the problem of the public’s faith in judicial integrity remains. As Judge Posner explained in the context of a ease decided under the Civil Rights Act of 1964, §§ 701(3), 703(a)(1), 42 U.S.C.A. §§ 2000e(j), 2000e-2(a)(l):
Mr. Rodriguez, a Chicago police officer, claims, I have no reason to doubt sincerely, that it violates his religious principles to guard abortion clinics. He is entitled to his view. He is not entitled to demand that his police duties be altered to conform to his view any more than a volunteer member of the armed forces is entitled to demand that he be excused from performing military duties that conflict with his religious faith ... or than a firefighter is entitled to demand that he be entitled to refuse to fight fires in the places of worship of religious sects that he regards as Satanic. The objection to recusal in all of these eases is not the inconvenience to the police department, the armed forces, or the fire department, as the case may be, though that might be considerable in some instances. The objection is to the loss of public confidence in governmental protective services if the public knows that its protectors are at liberty to pick and choose whom to protect.
The public knows that its protectors have a private agenda; everyone does. But it *740 .would like to think that they leave that agenda at home when they are on duty— that Jewish policemen protect neo-Nazi demonstrators, that Roman Catholic policemen protect abortion clinics, that Black Muslim policemen protect Christians and Jews, that fundamentalist Christian policemen protect noisy atheists and white-hating Rastafarians, that Mormon policemen protect Scientologists, and that Greek-Orthodox policemen of Serbian ethnicity protect Roman Catholic Croats. We judges certainly want to think that U.S. Marshals protect us from assaults and threats without regard to whether, for example, we vote for or against the pro-life position in abortion cases.
Rodriguez v. City of Chicago, 156 F.3d 771, 779 (7th Cir. 1998) (Posner, C.J., concurring) (emphasis added). In Endres v. Indiana State Police, 349 F.3d 922, 926 (7th Cir. 2003), the Seventh Circuit upheld the termination of a state police officer who would not defend a casino because it would violate his religious beliefs, emphasizing
the need to hold police officers to their promise to enforce the law without favoritism—as judges take an oath to enforce all laws, without regard to their (or the litigants’) social, political, or religious beliefs. Firefighters must extinguish all fires, even those in places of worship that the firefighter regards as heretical. Just so with, police.
Id. at 927 (emphasis added).
[¶32] Allowing Judge Neely to opt out of same-sex marriages is contrary to the compelling state interest in maintaining an independent and impartial judiciary. Judge Neely, like all judges, has taken an oath to enforce all laws, and the public depends upon an impartial judiciary, regardless of religious sentiment. “The objection is to the loss of public confidence in [the judiciary] if the public knows that its [judges] are at liberty to pick and choose whom to [serve].” Rodriguez, 156 F.3d at 779.
[¶33] “The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens.” Bowen v. Roy, 476 U.S. 693, 699, 106 S.Ct. 2147, 2152, 90 L.Ed.2d 735 (1986). In Bowen,- parents claimed that the government’s requirement that they provide a social security number for their child in order to receive government benefits violated their sincerely held religious beliefs that the number would “rob the spirit” of their daughter. Id. at 696, 106 S.Ct. at 2150. The Court distinguished between beliefs and conduct, finding that the parents’ issue implicated conduct and therefore was not entitled to absolute protection under the First Amendment. Id. at 699, 106 S.Ct. at 2152. It rejected the parents’ claim, holding that “[t]he Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government’s internal procedures.” Id. at 700,106 S.Ct. at 2152.
[¶34] Amici Curiae point out that in many cases, courts have required accommodation for religious beliefs. For instance, in American Postal Workers Union, San Francisco Local v. Postmaster General, 781 F.2d 772, 776 (9th Cir. 1986), the court held that Title VII of the Civil Rights Act of 1964 required the post office to determine reasonable accommodations for postal workers who believed that processing draft registration forms was contrary to them religious beliefs. But there, unlike in Rodriguez and Endres, there was no issue of public confidence in the neutrality of the clerks processing draft registrations. Amici Curiae also cite Haring v. Blumenthal, 471 F.Supp. 1172 (D.C. Cir. 1979), another Title VII case in which the court held that the Internal Revenue Service was required to allow its employee to disqualify himself from handling applications for exemptions from groups whose practices were abhorrent to his religious beliefs. There, the court rejected the argument that the integrity of the Internal Revenue Service was at stake, holding that “[i]t is difficult to see how that stand could impair taxpayer confidence in the tax system or the impartiality of the IRS.” Id. at 1183. In contrast, in Judge Neely’s ease, public confidence in the judiciary is the central issue.
[¶35] Perhaps the seminal case representing government accommodation to freedom *741 of religion is Wisconsin v. Yoder, 406 U.S. 206, 208, 92 S.Ct. 1526, 1529, 32 L.Ed.2d 15 (1972). In Yoder, the Court found unconstitutional Wisconsin’s application of its compulsory school attendance law to Amish parents who believed that any education beyond eighth grade undermined their entire, religiously-focused way of life. 406 U.S. at 235-36, 92 S.Ct. 1526. The Yoder opinion emphasized “the interrelationship of belief with [the Amish] mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization,” and how as a result compulsory high-school education would “substantially interfer[e] with the religious development of the Amish child and his integration into the way of life of the Amish faith community.” Id. at 218, 235, 92 S.Ct. at 1534, 1543. The Court held compulsory attendance at any school—whether public, private, or home-based—prevented these Amish parents from making fundamental decisions regarding their children’s religious upbringing and effectively overrode their ability to pass their religion on to their children, as them faith required. Id. at 233-35, 92 S.Ct. at 1542-43.
[¶36] There are obvious distinctions between Judge Neely’s case and Yoder. She is required by the Wyoming Code of Judicial Conduct to perform a ministerial judicial function in an impartial manner. Unlike the Amish in Yoder, occasionally performing this function does not threaten her very “way of life” by impacting a distinct community and life style. Yoder emphasized that its holding was essentially sui generis, as few sects could make a similar showing of a unique and demanding religious way of life that is fundamentally incompatible with any schooling system. See Yoder, 406 U.S. at 235-36, 92 S.Ct. at 1543. Judge Neely can make no such showing. Moreover, in Yoder, the Amish parents had been criminally convicted for violating Wisconsin’s compulsory school attendance law. Id. at 207, 92 S.Ct. at 1529. Judge Neely is not compelled to serve as a part-time circuit court magistrate and does not face criminal prosecution.
[¶37] Neither Judge Neely nor Amici Curiae direct us to any case in which accommodation for religious beliefs, has been required. when the requested accommodation would undermine the fundamental function of the position. “The First Amendment ... gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities.” Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 710, 105 S.Ct. 2914, 2918, 86 L.Ed.2d 557 (1985) (citations omitted). There is no less restrictive alternative than discipline for Judge Neely that would serve the compelling state interest in judicial integrity.
[¶38] Judge Neely’s refusal to perform marriage ceremonies for same-sex couples, in spite of the law recognizing their right to be married, implicates the compelling state interest in. maintaining the integrity, independence, and impartiality of the judiciary.- Imposing discipline on her for such conduct is not underinelusive or overbroad. We will address the scope of the discipline necessary and'permissible under the narrowly-tailored standard below. See infra ¶¶ 72-75.

II. Does the Wyoming Constitution permit this Court to discipline Judge Neely for announcing that her religious beliefs prevent her front officiating same-sex marriages?

[¶39] The Wyoming Constitution can offer “broader protection than the United States Constitution.” Andrews v. State, 2002 WY 28, ¶ 31, 40 P.3d 708, 715 (Wyo. 2002); see also O’Boyle v. State, 2005 WY 83, ¶ 23, 117 P.3d 401, 408 (Wyo. 2005). “Recourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articulable, reasonable and reasoned.” Bear Cloud v. State, 2014 WY 113, ¶ 14, 334 P.3d 132, 137 (Wyo. 2014) (quoting Saldana v. State, 846 P.2d 604, 622 (Wyo. 1993) (Golden, J., concurring)).
[¶40] Judge Neely offers an articulable, reasonable, and reasoned argument for considering whether Wyoming Constitution, article 1, section 18 and article 21, section 25 *742 provide greater protection than does the United States Constitution.[9] They provide:
The free exercise and enjoyment of religious profession and worship without discrimination or preference shall be forever guaranteed in this state, and no person shall be rendered incompetent to hold any office of trust or profit, or to serve as a witness or juror, because of his opinion on any matter of religious belief whatever; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state.
Wyo. Const, art. 1, § 18. Judge Neely points out that this provision is significantly broader than the similar provision in the United States Constitution—“but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.” U.S. Const, art. VI.
Perfect toleration of religious sentiment shall be secured, and no inhabitant of this state shall ever be molested in person or property on account of his or her mode of religious worship.
Wyo. Const, art. 21, § 25. In contrast, the United States Constitution states that “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof....” U.S. Const, amend. I.
[¶41] In construing the Wyoming Constitution, we follow the same rules as those we apply to statutory interpretation. Our “fundamental purpose is to ascertain the intent of the framers.” Cathcart v. Meyer, 2004 WY 49, ¶ 39, 88 P.3d 1050, 1065 (Wyo. 2004) (citations omitted). Judge Neely argues that these provisions in Wyoming’s Constitution are broader than the First Amendment of the United States Constitution, and broader than those of other states. She further directs us to the debates during the constitutional convention, which indicate article 1, section 18 was adopted in conjunction with the defeat of a proposed amendment, “aimed at the state’s Mormon population, that would have prohibited anyone who entered into or believed in polygamy from voting, holding public office, or serving as a juror.” Robert B. Keiter & Tim Newcomb, The Wyoming State Constitution, at 69 (2011).[10] Courts of other states with similar constitutional language have held that their state constitutions provided stronger protection than the federal constitution. See First Covenant Church of Seattle v. City of Seattle, 120 Wash.2d 203, 840 P.2d 174, 224 (1992); State v. Hershberger, 462 N.W.2d 393, 397 (Minn. 1990).
[¶42] The language of Wyoming Constitution article 1, section 18 and article 21, section 25 may offer broader protections than does the United States Constitution, but we do not find that the protections they may offer are applicable to Judge Neely’s circumstances here. That is because neither her opinion on matters of her religious belief, nor her religious sentiment, are the focus of the state action.
[¶43] Referring to the debates of the constitutional convention, Judge Neely asserts that this Court should conclude that, “just as a Mormon judge who believes in polygamy cannot be excluded from judicial office because of her beliefs about marriage, neither may Judge Neely or others be expelled as municipal judges because of their sincere beliefs about that issue.” This argument ignores the important distinction between the freedom to believe and the freedom to act. “While the freedom to believe is *743 absolute, the freedom to act cannot be. ‘Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection.’ ” Trujillo v. State, 2 P.3d 567, 576-77 (Wyo. 2000) (quoting Cantwell, 310 U.S. at 304, 60 S.Ct. at 903). In Trujillo, we rejected the appellant’s challenge to state drug laws on both United States and Wyoming constitutional grounds, and we held the notion that compliance with the law could be “contingent upon the law’s coincidence with his religious beliefs,” thus making him “a law unto himself,” would contradict “both constitutional tradition and common sense.” Trujillo, 2 P.3d at 575 n.4, 577 (quoting Smith, 494 U.S. at 885, 110 S.Ct. at 1603). The Wyoming Constitution does not give Judge Neely the prerogative to perform her judicial functions contingent upon the law’s coincidence with her religious beliefs.
• [¶44] Just like the county clerk in Miller v. Davis, 123 F.Supp.3d 924, 944 (E.D. Ky. 2015), appeal dismissed, cause remanded by Miller v. Davis, Nos. 15-5880, 15-5978, 2016 WL 3755870 (6th Cir. July 13, 2016) (finding county clerk must issue marriage licenses to same-sex couples), Judge Neely remains “free to practice her [religious] beliefs,” and she is “free to believe that marriage is a union between one man and one woman, as many Americans do. However, her religious convictions cannot excuse her from performing the duties that she took an oath to perform. ...” Id. “The State is not asking her to condone same-sex unions on moral or religious grounds, nor is it restricting her from engaging in a variety of religious activities.” Id. Judge Neely is not being “molested ... on account of [her] mode of religious worship.” Wyo. Const, art. 21, § 25.
[¶45] The Alabama Supreme Court rejected a similar argument by Chief Justice Roy Moore, when he was removed from his position as a consequence of his refusal to comply with a federal court order enjoining him to remove a monument to the Ten Commandments that he had placed in the rotunda of the Alabama Judicial Building. Moore v. Judicial Inquiry Comm’n of State of Alabama, 891 So.2d 848, 851 (Ala. 2004). Justice Moore argued that he was being removed from office because of a- “religious test,” in violation of the Alabama Constitution[11] and the free exercise clause of the United States Constitution. The court cited with approval two federal courts which
concluded that this ease is not about a public official’s right to acknowledge God, as Chief Justice Moore contends. Rather, this case is about a public official who took an oath to uphold the Constitution of the United States and then refused to obey a valid order of a United States District Court holding that the placement of the monument in the Judicial Building violated the Establishment Clause of the First Amendment to the United States Constitution.
Id. at 859.
[¶46] It is likely correct, as Judge Neely contends, that “a Mormon judge who believes in polygamy cannot be excluded from judicial office because of her beliefs about marriage,” but if a judge broke the law against polygamy by maintaining multiple marriages, she would be removed as a judge because she broke the law, not because of her beliefs. See, e.g., In re Steed, 131 P.3d 231, 232 (Utah 2006) (The court removed the judge because his multiple marriages were contrary to law, holding “it is of little or no consequence that the judge may believe a criminal statute is constitutionally defective.”) Similarly, Judge Neely has done more than express her opinion on a matter of religious belief. She has taken the position that, although she has sworn to “support, obey and defend” the constitutions of the United States and Wyoming, when it comes to same-sex marriages, she will decline to do so. Judge Neely is not being disciplined “because of [her] opinion on any matter of religious belief,” she is being disciplined because of her conduct. Thus, Wyoming Constitution article 1, section 18 and article 21, section 25 are not violated by such discipline.
*744 [¶47] Our conclusion is further reinforced by an examination of the entire Wyoming Constitution, for “[e]very statement in the constitution must be interpreted in light of the entire document, with all -portions thereof read in pari materia.” Cathcart, 2004 WY 49, ¶ 40, 88 P.3d at 1065-66. In addition to protecting religious freedom, our constitution recognizes the importance of equal rights for all.
[¶48] “In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are created equal.” Wyo. Const, art. 1, § 2. “No person shall be deprived of life, liberty or property without due process of law.” Wyo. Const, art. 1, § 6.
Since equality in the enjoyment of natural and civil rights is only made sure through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or any circumstance or condition whatsoever other than individual incompetency, or unworthiness duly ascertained by a court of competent jurisdiction.
Wyo. Const, art. 1, section 3. The Wyoming Constitution also contains its own variation of the federal establishment clause. See Wyo, Const, art. 1, § 19 (Appropriations for sectarian or religious societies or institutions prohibited); Wyo. Const, art. 7, § 12 (Sectarianism prohibited). “Considering the state constitution’s particular call for equal protection, the call to recognize basic rights, and notion that these particular protections are merely illustrative, the Wyoming Constitution is construed to protect people against legal discrimination more robustly than does the federal constitution.” Johnson v. State Hearing Examiner’s Office, 838 P.2d 158, 165 (Wyo. 1992). Judge Neely would have us find, not only that the religious liberty provisions of the Wyoming Constitution provide greater protections than the United States Constitution provides, but also that they trump all other provisions of the Wyoming Constitution, That is contrary to the rules of constitutional interpretation.
[¶49] Applying our rale that, in interpreting the constitution, “no part will be inoperative or superfluous,” Geringer v. Bebout, 10 P.3d 514, 520 (Wyo. 2000), we could not read the provisions recognizing religious liberty to render those provisions recognizing equal rights and due process to be inoperative or superfluous. Judge Neely contends that the religious freedom provisions of the Wyoming Constitution entitle her to act in accordance with her religious beliefs, so long as they do not “foster[] licentiousness or jeopardize!] public safety.” Such a rule would permit her, and any other judge, to apply the law in accordance with their individual views on what “divine law” required, to the exclusion of any other right under the Wyoming Constitution. That is an untenable position.
Can a man excuse his practices ... because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances,
Reynolds v. United States, 98 U.S. 145, 166-67, 26 L.Ed. 244 (1878).
[¶60] Further, the broad reading of the Wyoming constitutional provisions recognizing freedom of religion that Judge Neely urges upon us would also require, us to find that those provisions of the state constitution trump the federal due process and equal protection rights that the United States Supreme Court relied upon in Obergefell, 135 S.Ct. at 2602-03. If we held that freedom of religious opinion meant no state official in Wyoming had to marry a same-sex couple if it offended his or her religious belief, the right of same-sex couples to marry under the United States Constitution would be obviated. “The State of Wyoming is an inseparable part of the federal union, and the constitution of the United States is the supreme law of the land.” Wyo. Const, art. 1, § 37.
This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in *745 the Constitution or Laws of any State to the Contrary notwithstanding.
U. S. Const, art. VI.
[¶51] The United States Supreme Court explained this when Arkansas state officials sought to avoid school desegregation, arguing in part that they were not bound by the Court’s holding in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1964).
Article VI of the Constitution makes the Constitution the ‘supreme Law of the Land.’ In 1803, Chief Justice Marshall, speaking for a unanimous Court, referring to the Constitution as ‘the fundamental and paramount law of the nation,’ declared in the notable case of Marbury v. Madison, 6 U.S. (1 Cranch 137), 177, 2 L.Ed. 60 [ (1803) ], that ‘It is emphatically the province and duty of the judicial department to say what the law is.’ This decision declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system. It follows that the interpretation of the Fourteenth Amendment enunciated by this Court in the Brown case is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect on the States ‘any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.’ Every state legislator and executive and judicial officer is solemnly committed by oath taken pursuant to Art. VI, ¶3 ‘to support this Constitution.’ Chief Justice Taney, speaking for a unanimous Court in 1869, said that this requirement reflected the framers’ ‘anxiety to preserve it [the Constitution] in full force, in all its powers, and to guard against resistance to or evasion of its authority, on the part of a State. * * *’ [Citation omitted.]
Cooper v. Aaron, 358 U.S. 1, 18, 78 S.Ct. 1401, 1409-10, 3 L.Ed.2d 5 (1958); see also Williams v. Eaton, 443 F.2d 422, 429 (10th Cir. 1971) (“[I]f plaintiffs establish a violation of Federal constitutional rights and entitlement to relief under the Federal civil rights acts, the Wyoming Constitution may not immunize the defendants and override the Federal constitutional principles....”).
[¶52] Just last year, Alabama Chief Justice Roy Moore was suspended from office because of his instruction to Alabama probate judges to disregard the opinion of the United States Supreme Court. He said that “the Obergefell opinion, being manifestly absurd and unjust and contrary to reason and divine law, is not entitled to precedential value.” In the Matter of: Roy S. Moore, Chief Justice, Supreme Court of Alabama, Alabama Court of the Judiciary Case No. 46, Final Judgment, at 15 (September 30, 2016). As the Court of the Judiciary held, an individual judge’s interpretation of divine- law must give way to the “supreme law of the land.” Id. at 34.[12]
[¶53] The religious freedom provisions of the Wyoming Constitution do not prohibit the state from proceeding with disciplinary *746 action against Judge Neely for her stated refusal to conduct same-sex marriages.

III. Are the provisions of the Wyoming Code of Judicial Conduct alleged to have been violated by Judge Neely void for vagueness?

[¶54] Judge Neely argues that the provisions of the Wyoming Code of Judicial Conduct that she is charged -with violating are void for vagueness, citing U.S. Const, amends. I and XIV; Wyo. Const, art. 1, §§ 6, 7, 20. “The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement.” Gentile v. State Bar of Nevada, 501 U.S. 1030,1051, 111 S.Ct. 2720, 2732,115 L.Ed.2d 888 (1991). A “provision is not unconstitutionally vague if its wording can reasonably be said to provide sufficient notice to a person of ordinary intelligence that his conduct was [contrary to the rules].” Guilford v. State, 2015 WY 147, ¶ 15, 362 P.3d 1015, 1018 (Wyo. 2015). Judge Neely again mischaracterizes the conduct for which she is being disciplined as “honestly conveying her religious beliefs,” and she argues that “the Commission could use Rule 1.2’s vague language to punish a judge who expresses her moral belief that human life begins at conception....” However, as discussed above, Judge Neely is not being disciplined for her expression of her religious beliefs, but for her conduct in refusing to impartially perform her judicial functions.
[¶55] Further, Judge Neely ignores the law which recognizes that the standard for vagueness is relaxed when applied to codes of professional conduct.
Given the traditions of the legal profession and an attorney’s specialized professional training, there is unquestionably some room for enforcement of standards that might be impermissibly vague in other contexts; an attorney in many instances may properly be punished for “conduct which all responsible attorneys would recognize as improper for a member of the profession.”
Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 666, 105 S.Ct. 2265, 2289, 85 L.Ed.2d 652 (1985) (Brennan, J., concurring in part and dissenting in part) (citation omitted). The same rationale has been applied to judicial codes of conduct. See, e.g., Matter of Halverson, 123 Nev. 493, 169 P.3d 1161, 1176 (2007) (“[W]hen evaluating a statute that applies only to judges, the issue is whether an ordinary judge could understand and comply with it.”). And in fact, courts have consistently rejected vagueness challenges in judicial discipline matters. Matter of Halverson, 169 P.3d at 1176; Judicial Conduct Comm’n v. McGuire (In re McGuire), 685 N.W.2d 748, 761 (N.D. 2004); In re Barr, 13 S.W.3d 525, 565 (Tex. Rev. Trib. 1998); In re Complaint Against Harper, 77 Ohio St.3d 211, 673 N.E.2d 1253, 1263, (1996); In re Disciplinary Proceeding Against Ritchie, 123 Wash.2d 725, 870 P.2d 967, 972 (1994); Matter of Young, 522 N.E.2d 386, 387-88 (Ind. 1988); Matter of Seraphim, 97 Wis.2d 485, 294 N.W.2d 485, 493, (1980).
[¶56] Although Judge Neely is not an attorney, she has been a municipal court judge since 1994, and she served on the Select Committee to review the Wyoming Code of Judicial Conduct in 2008. That committee met many times, and as a consequence, Judge Neely was familiar with the Wyoming Code of Judicial Conduct. Judge Neely’s own conduct tells us that she understood her refusal to perform same-sex marriages could be a code violation. She met with Judge Haws to express her concern to him, and then she wrote to the Judicial Ethics Advisory Committee to ask if she could recuse herself from officiating same-sex weddings “without fear of civil rights repercussions.” We do not mean to suggest that Judge Neely should be faulted for asking the questions (although we note, as did the Judicial Ethics Advisory Committee, that her request for guidance from them came after she had already engaged in the conduct at issue here, and appeared to be more of a request for their approval than a request for guidance); we simply observe that this conduct indicates she suspected her position would put her in conflict with the Wyoming Code of Judicial Conduct. We find that an ordinary judge would also understand that refusal to conduct some marriages on the basis of the sexual *747 orientation of the couple did not comply with the Code of Judicial Conduct and thus, it is not unconstitutionally vague.

IV. Did Judge Neely violate the Wyoming Code of Judicial Conduct?

[¶57] Because the Wyoming Supreme Court makes the initial determination whether to impose discipline on a judicial officer, we do not “review” a recommendation of the Commission on Judicial Conduct and Ethics in the same way that we review decisions of the district courts. Wyo. Const, art. 5, § 6(f). Our approach here is analogous to our approach in attorney discipline eases. While the Court “gives due consideration to the findings and recommendations of the Board, [] ‘the ultimate judgment in these cases is vested in this Court.’ ” Bd. of Prof l Responsibility v. Custis, 2016 WY 59, ¶¶ 19-21, 348 P.3d 823, 829 (Wyo. 2015) (citations omitted). Although the Commission urges us to give its findings a “significant degree of deference,” we decline to do so, particularly in this case which was decided on cross-motions for summary judgment, which we review de novo. Snell v. Snell, 2016 WY 49, ¶ 18, 374 P.3d 1236, 1240 (Wyo. 2016) (On review of summary judgment, “[w]e examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may' fairly be drawn from the record.” (citation omitted)). We therefore engage in a de novo review of the record to decide whether there is clear and convincing evidence that Judge Neely violated the Wyoming Code of Judicial Conduct. Rules Governing the Commission on Judicial Conduct and Ethics, Rule 16(b). “Clear and convincing evidence” is defined as “that kind of proof which must persuade ... that the truth of a contention is highly probable.” Rules Governing the Commission on Judicial Conduct and Ethics, Rule 2(b). We review questions of law de novo, without giving any deference to the lower tribunal’s determinations. Pope v. Rosenberg, 2015 WY 142, ¶ 15, 361 P.3d 824, 829 (Wyo. 2015).
[¶58] The primary objective of judicial discipline is to hold judges to a high ethical standard that fosters public confidence in the integrity and impartiality of the judiciary. Garwin, supra, at 3; In re John-stone, 2 P.3d 1226, 1234 (Alaska 2000). “Unlike the other branches of government, the authority of the judiciary turns almost exclusively on its credibility and the respect warranted by its rulings....” Carey v. Wolnitr zek, 614 F.3d 189, 194 (6th Cir. 2010). The Preamble to the Wyoming Code of Judicial Conduct describes the critical importance of such a high standard for the judiciary:
An independent, fair and impartial judiciary is indispensable to our system of justice. The United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society. Thus, the judiciary plays a central role in preserving the principles of justice and the rule of law. Inherent in all the Rules contained in this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system.
A. Rule 1.1.
[¶59] Rule 1.1. Compliance with the Law.
A judge shall comply with the law, including the Code of Judicial Conduct.
The Commission found that Judge Neely’s unwillingness to perform same-sex marriages is a violation of Rule 1.1. The vast majority of Rule 1.1 violations are found when a judge violates a criminal law in his or her personal conduct. See, e.g., In re Coffey’s Case, 157 N.H. 156, 949 A.2d 102, 120 (2008) (judge ■violated code when she transferred assets in violation of Fraudulent Transfer Act); Disciplinary Counsel v. Ault, 110 Ohio St.3d 207, 852 N.E.2d 727, 728, 730 (2006) (municipal court judge, convicted of attempting to obtain dangerous drugs by deception, violated code). As leading commentators have explained: “Whereas Rule 1.1 addresses the judge’s duty to comply with the law in his or her daily life, this Rule [Rule 2.2] directs the judge to follow the rule of law when deciding cases.” Garwin, supra, at 93. Here, there is *748 no suggestion that Judge Neely has failed to comply with the law in her daily. life.
[¶60] The Commission directs us to a handful of cases in which judges were found to have violated Rule 1.1 as a result of their failure to properly apply the law in executing their judicial functions. However, in all those cases, the judges had violated clear procedural rules of law. See In re Bennington, 24 N.E.3d 958, 961 (Ind. 2015) (The judge did not comply with Indiana law when she did not “(a) sentence [defendant] to a set time in jail for contempt, (b) indicate when he would be released, (c) reduce her order to wilting as Indiana Code section 34-47-2-4 requires, (d) appoint him an attorney before jailing him for contempt, nor (e) inform him of his right to appeal his contempt sentence.”); In re Harkin, 958 N.E.2d 788, 791 (Ind. 2011) (The judge violated Rule 1.1 when he failed to comply with Indiana law by “referring traffic infraction litigants to the Traffic School and then dismissing their cases upon their completion of the program without any dismissal request from the prosecutor....”); In re Young, 943 N.E.2d 1276, 1280 (Ind. 2011) (judge’s imposition of penalties for traffic infractions in excess of amount authorized by law violated Rule 1.1). The Commission also cites a Texas case in which a judge was disciplined for his failure to comply with the law, for his use of writs of attachment to secure the accused’s appearance at a peace bond hearing, his use of mediation in the peace bond context, and his issuance of arrest warrants without a complete written complaint, all in violation of Texas law. In re Jones, 55 S.W.3d 243, 248 (Tex. Spec. Ct. Rev. 2000). The Minnesota Supreme Court found violations of Rule 1.1 as a result of failure to comply with the law in the judge’s judicial role in In re Perez, 843 N.W.2d 562, 564 (Minn. 2014) (The judge “failed to release opinions in compliance with Minn.Stat. § 271.20, falsely certified that he was in compliance -with Minn.Stat. § 271.20, and made false statements in his orders regarding the date cases were submitted for decision, in violation of Minn.Stat. § 271.20.... ”).
[¶61] Even if we were to adopt this minority application of Rule 1.1, Judge Neely has not violated a clear procedural rule governing the performance of her legal duties. As a municipal court judge, she had no authority to perform marriages. As a part-time circuit court magistrate, she had the power to perform marriage ceremonies, but she was not required to do so. She has not violated the law in her daily life, and she has not violated a procedural rule of law, as occurred in the cases cited by the Commission, see supra ¶ 60. Our conclusion that the requirement to comply with the law at Rule 1.1 addresses a much more specific violation than is present here is bolstered by the existence of other rules applicable to a judge’s application of the law. Rules 1.2, 2.2, and 2.3 address the necessity of a judge’s impartiality and absence of bias in the performance of her duties. Those rules are better fitted to the type of judicial misconduct at issue here. There is no need to stretch the requirement to comply with the law to this situation, where performance of marriages is a discretionary duty. We recognize that the language of Rule 1.1 includes compliance with the Code of Judicial Conduct. So to the extent that Judge Neely has violated other rules of the code, she has violated Rule 1.1. However, we find that, standing alone, her conduct does not violate Rule 1.1.
B. Rule 1.2.
[¶62] Rule 1.2. Promoting Confidence in the Judiciary.
A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.
The parties dispute.the proper application of the “objective standard” that should be applied to the “appearance of impropriety” determination. Judge Neely advocates the use of the standard applied by the Mississippi Supreme Court: “The test for impropriety is whether a judge’s impartiality might be questioned by a reasonable person knowing all the circumstances.” Mississippi Comm’n on Judicial Performance v. Boland, 975 So.2d 882, 895 (Miss. 2008). The Commission contends that this standard is unduly restrictive and argues that we should apply the standard used by Alaska, which sets forth the *749 “objectively reasonable person test” to determine whether the judge failed “to use reasonable care to prevent objectively reasonable persons from believing an impropriety was afoot.” In re Johnstone, 2 P.3d at 1235. We do not find this debate to be particularly fruitful. We apply the standard contained in the Wyoming Code of Judicial Conduct comments to this rule:
Actual improprieties include violations of law, court rules or provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge’s honesty, impartiality, temperament, or fitness to serve as a judge.
Wyoming Code of Judicial Conduct, Rule 1.2, Comment 5. It goes without saying that the “reasonable minds” would be fully informed of the relevant facts and circumstances, and we do not find conflict between the standards proposed by the parties,[13]
[¶63] The Commission found that Judge Neely’s announcement that she would not perform same-sex marriages violated Rule 1.2 by giving “the impression to the public that judges, sworn to uphold the law, may refuse to follow the law of the land.” Judge Neely contends that “no reasonable person knowing the following facts would conclude that Judge Neely’s religious beliefs about marriage render her incapable of fairly adjudicating legal matters for LGBT citizens.” However, the facts she goes on to cite are unpersuasive. First, she emphasizes that solemnizing marriages is a discretionary function, but we reject that argument because the requirement of impartiality cannot be limited to only certain types of judicial functions. In essence, this is an argument that bias or prejudice is acceptable if the judicial function is discretionary. Our society requires a fair and impartial judiciary no matter how the judicial function is classified. The Code of Judicial Conduct recognizes this when it says “The Rules in this Code have been formulated to address the ethical obligations of any person who serves a judicial function, and are premised upon the supposition that a uniform system of ethical principles should apply to all those authorized to perform judicial functions.” Wyoming Code of Judicial Conduct, Application, Comment 1.
[¶64] The Washington Commission on Judicial Conduct reached the same conclusion in its Stipulation, Agreement and Order of Admonishment with a judge who told his colleagues he was “uncomfortable” performing same-sex marriages and asked them to officiate in his stead. In re Matter of: The Honorable Gary Tabor, Thurston County Superior Court Judge, WA Jud. Disp. Op. 7251-F-158, 2013 WL 5853965, at *1 (Wash. Com. Jud. Cond. 2013). In response to press inquiries, Judge Tabor explained that his decision was based on his religious views, and he expressed his belief that “since judges are not required, but are only permitted, to perform marriages,” he was within his rights to decline to perform same-sex marriages. The Commission on Judicial Conduct disposed of that argument:
Respondent is not required as a judicial officer to solemnize marriages. Having chosen to make himself available to solemnize some weddings, however, he is bound by the Code of Judicial Conduct to do so in a way that does not discriminate or appear to discriminate against a statutorily-protected class of people.
Id. at *2.
[¶65] Judge Neely then contends that solemnizing marriages is unlike other magisterial functions because it “involves personally *750 participating in, celebrating, and expressing support for a marital union....” However, Wyoming law does not require the person performing the ceremony to condone the union. Marriage is “a civil contract....” Wyo. Stat. Ann. § 20-1-101.
In the solemnization of marriage no particular form is required, except that the parties shall solemnly declare in the presence of the person performing the ceremony and at least two (2) attending witnesses that they take each other as husband and wife.
Wyo. Stat. Ann. § 20-l-106(b) (LexisNexis 2015).
[¶66] Judge Neely states that she would perform other magisterial functions for gays and lesbians, she would help them find someone else who would perform marriages, she does not question the legality of same-sex marriage in Wyoming and would recognize the validity of such marriages, and that homosexuals in Pinedale do not question her impartiality as a judge. We accept all of these allegations as true. However, they are insufficient to overcome the fact that she has unequivocally stated her refusal to perform marriages for same-sex couples, which creates the perception in reasonable minds that she lacks independence and impartiality.[14] We conclude that Judge Neely has violated Rule 1.2.
C. Rule 2.2.
[¶67] Rule 2.2. Impartiality and Fairness.
A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially.
Judge Neely’s primary function as a circuit court magistrate was to perform marriages. She has taken the position that she is willing to do that for one class of people (opposite-sex couples), but not for another (same-sex couples), in spite of the fact that the law provides both classes are entitled to be married. That is not fair and impartial performance by any measure. Comment 2 to Rule 2.2 is exactly on point:
Although each judge comes to the bench with a unique background and personal philosophy, a judge must interpret and apply the law without regard to whether the judge approves or disapproves of the law in question.
Wyoming Code of Judicial Conduct, Rule 2.2, Comment 2. The Court respects Judge Neely’s religious beliefs, but when she allows them to interfere with her fair and impartial application of the law, she violates Rule 2.2 and undermines the public confidence in the integrity of the judiciary.
D. Rule 2.3.
[¶68] Rule 2.3. Bias, Prejudice, and Harassment.
(A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.
(B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge’s direction and control to do so.
The Commission found that Judge Neely’s “expression of her inability to perform same sex marriages, manifested a bias with respect to sexual orientation.”
[¶69] Judge Neely argues that her comments to the reporter did not manifest “bias or prejudice”[15] based upon “sexual orientation,” but merely expressed her sincerely held religious belief. But Judge Neely did more than express her religious belief. She *751 expressed her position that, in her performance of her judicial function, the law would have to yield to her religious beliefs. (“When law and religion conflict, choices have to be made.”) The dissent suggests that Judge Neely should not be disciplined because no same-sex couple has asked her to officiate at a wedding and been turned away. But that is not likely to happen, given her clear and public statement refusing to perform same-sex marriages. She would therefore perform her judicial functions as a circuit court magistrate for one class of people, but not another.
[¶70] Comment 2 to Rule 2.3 states in part: “A judge must avoid conduct that may reasonably be perceived as prejudiced or biased.” Judge Neely’s refusal to perform same sex marriages exhibits bias and prejudice toward homosexuals. See Supreme Court of Ohio, Board of Professional Conduct, Opinion 2015-1, Judicial Performance of Civil Marriages of Same-Sex Cowples, at 4-5 (August 7, 2015) (“A judge who is willing to perform marriages of only opposite-sex couples because of his or her personal, moral, or religious beliefs, may be viewed as possessing a bias or prejudice against a specific class or group of people based on sexual orientation”) Judge Neely asserts in her affidavit that she has no bias or prejudice against homosexuals. We examine the record in a light most favorable to Judge Neely and accept that averment, but our inquiry is whether her conduct may reasonably be perceived as prejudiced or biased. See Caperton, 556 U.S. at 881, 129 S.Ct. at 2262 (“The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is ‘likely’ to be neutral. ...”); In Matter of: The Honorable Gary Tabor, 2013 WL 5853965, at *3 (“[A] judge must not only be impartial, but must also be perceived as impartial....”). Judge Neely’s refusal to conduct marriages on the basis of the couple’s sexual orientation can reasonably be perceived to be biased. We therefore conclude that Judge Neely violated Rule 2.3.
[¶71] Our conclusion that Judge Neely’s expressed refusal to conduct same-sex marriages violates the Code of Judicial Conduct is in line with every other tribunal that has considered the question. The judges in In re Matter of: The Honorable Gary Tabor and In re Roy S. Moore, were disciplined for their conduct. Five state advisory commissions offered opinions, consistently stating that a judge may not perform judicial functions for some parties while declining to perform them for same-sex couples without violating the Code of Judicial Conduct: Supreme Court of Ohio, Board of Professional Conduct, Opinion 2015-1, Judicial Performance of Civil Marriages of Same-Sex Couples (August 7, 2015) (a judge may not decline to perform same-sex marriages, and may not decline to perform all marriages in order to avoid marrying same-sex couples); Supreme Court of Wisconsin, Judicial Conduct Advisory Committee, Opinion No. 15-1 (August 18, 2015) (judge may not decline to perform only same-sex marriages, but may decline performing all marriages); Arizona Supreme Court, Judicial Ethics Advisory Committee, Revised Advisory Opinion 15-01, Judicial Obligation to Perform Same-Sex Marriages (March 9, 2015) (judge may not distinguish between same-sex and opposite-sex couples); Nebraska Judicial Ethics Committee Opinion, Opinion 15-1 (June 29, 2015) (a judge who is willing to perform traditional marriage manifests bias or prejudice by refusing to perform same-sex marriage); Judicial Conduct Board of Pennsylvania Newsletter, Impartiality in Solemnizing Marriages, by Elizabeth A. Flaherty, Deputy Counsel, Judicial Conduct Board (No. 3 Summer 2014) (judge who decides not to perform wedding ceremonies for same-sex couples must opt out of officiating at all wedding ceremonies). Only in Mississippi Comm’n on Judicial Performance v. Wilkerson, 876 So.2d 1006, 1016 (Miss. 2004), did the tribunal find that a judge’s comments disparaging gays and lesbians did not violate the Code of Judicial Conduct. But there, only the judge’s speech as a private citizen was at issue; not his conduct as a judge, and there was no issue of performing marriages. See Boland, 975 So.2d at 892 (distinguishing Wilkerson on basis that judge in Boland made remarks while acting in her judicial capacity).

*752
SANCTIONS

[¶72] We turn to the determination of the appropriate sanctions to be imposed as a result of Judge Neely’s violations of Rules 1.2, 2.2, and 2.3 of the Wyoming Code of Judicial Conduct. The purpose of judicial discipline is primarily to protect the public, but of necessity it has punitive effects.
The punitive aspect of judicial discipline serves multiple purposes: it discourages further misconduct on the part of the disciplined judge and the judiciary as a whole; it reinforces the general perception that judicial ethics are important; and it promotes public confidence by demonstrating that the judicial system takes misconduct seriously. Punishment thus subserves the various goals of judicial discipline, but is a means, not an end.
In re Johnstone, 2 P.3d at 1234; see also In re Judicial Campaign Complaint Against O’Toole, 141 Ohio St.3d 355, 24 N.E.3d 1114, 1129 (2014) (listing purposes of judicial discipline).
[¶73] The Commission has recommended that Judge Neely be removed from her positions as a part-time circuit court magistrate and as a municipal court judge; however, we may modify or reject that recommendation. Wyo. Const, art 6, § 6(f)(iv); Rules Governing the Commission on Judicial Conduct and Ethics, Rule 19(a). We approach our sanctions analysis mindful of our standard under strict scrutiny, which requires us to narrowly tailor the restrictions on Judge Neely’s speech and religious expression. We endeavor to craft a sanction that does not “unnecessarily circumserib[e] protected expression.” White, 536 U.S. at 776, 122 S.Ct. at 2535 (Scalia, J., with three justice concurring and one concurring in the result) (quoting Brown v. Hartlage, 456 U.S. 45, 54, 102 S.Ct. 1523, 1529, 71 L.Ed.2d 732 (1982)). We are also guided by the relevant factors for determining the appropriate sanctions set forth in Rule 8(d)(2) of the Rules Governing the Commission on Judicial Conduct and Ethics:

(A)the nature, extent, and frequency of the misconduct

Judge Neely’s refusal to conduct same-sex marriages, and her indication that her religious beliefs would override the rule of law undermines public confidence in the integrity and impartiality of the judiciary. But her misconduct was an isolated response to a quickly-changing legal landscape, one in which many judges have experienced similar turmoil. See supra ¶ 71.

(B) the judge’s experience and length of service on the bench

Judge Neely has had a long career as a municipal court judge and as a part-time circuit court magistrate; a career for which she is widely respected.

(C) whether the conduct occurred in the judge’s official capacity or private life

As discussed above, the misconduct occurred in Judge Neely’s official capacity. She did not merely express her opinion about same-sex marriage, she expressed how that opinion would impact her performance of her judicial functions.

(D) the nature and extent to which the acts of misconduct injured other persons or respect for the judiciary

There is no evidence that any person has been injured. And while there is no evidence of injury to respect for the judieiary, under the objective standard that we apply, we have concluded that her conduct does undermine the public’s respect for the judiciary,

(E) whether and to what extent the judge exploited his or her position for improper purposes

Judge Neely has not exploited her position for improper purposes.

(F) whether the judge has recognized and acknowledged the wrongful nature of the conduct and manifested an effort to change or reform the conduct

Judge Neely has not recognized or acknowledged the wrongful nature of her conduct, nor has she indicated that she would consider performing same-sex marriages.

*753
(G) whether there has been prior disciplinary action concerning the judge, and if so, its remoteness and relevance to the present proceeding

There have been no prior disciplinary actions concerning Judge Neely.

(H) whether the judge complied with pri- or discipline or requested and complied with a formal ethics advisory opinion

Judge Neely requested a formal ethics advisory opinion, but only after she had engaged in the objectionable conduct.

(I) whether the judge cooperated fully and honestly with the Commission in the proceeding

Judge Neely cooperated fully and honestly with the Commission in the proceeding.
[¶74] Weighing these factors, we find that Judge Neely’s misconduct warrants a public censure. We further find that Judge Neely must perform her judicial functions, including performing marriages, with impartiality. She must either commit to performing marriages regardless of the couple’s sexual orientation, or cease performing all marriage ceremonies. This does not mean, as the dissent suggests, that no judge can now turn down any request to perform a marriage. What it means is that no judge can turn down a request to perform a marriage for reasons that undermine the integrity of the judiciary by demonstrating a lack of independence and impartiality. This is no different than allowing parties to exercise the right to peremptory challenges of jurors for any reason, while prohibiting them from challenging jurors on the basis of race or gender. See Beartusk v. State, 6 P.3d 138, 142 (Wyo. 2000); (citing Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). Depending on her choice, it will be up to the circuit court judge’s discretion to determine whether she will continue as a part-time circuit court magistrate. A part-time circuit court magistrate’s position is unique. Unlike a full-time circuit court magistrate or a circuit court judge, the -functions of a part-time circuit court magistrate’s job depend upon the particular needs of the circuit court judge appointing the magistrate. We therefore defer to the circuit • court judge who appointed Judge Neely to determine whether she can continue to serve the essential functions of that position.
[¶75] We decline to remove Judge Neely from her position as a municipal court judge; such a punishment would “unnecessarily circumscribe protected expression,” and we are mindful of our goal to narrowly tailor the remedy.

CONCLUSION

[¶76] We conclude that Judge Ruth Neely shall receive á public censure; Judge Neely shall either perform no marriage ceremonies or she shall perform marriage ceremonies regardless of the couple’s sexual orientation; and each party will bear its own fees and costs.
FOX, Justice, delivers the opinion of the' Court; KAUTZ, Justice, files a dissenting opinion, in which DAVIS, Justice, joins.

.Judge Neely is not a lawyer and has no formal legal training.

.This oath is required of circuit court magistrates by Wyo. Stat. Ann. § 5-9-203 (LexisNexis 2015).

.That decision, essentially finding that same-sex *734 marriage was legal in Wyoming, was established as the law of the land by the United States Supreme Court in Obergefell v. Hodges, — U.S. —, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015).

4. This letter to the Judicial Ethics Advisory Committee would normally be a protected communication. However, this Court's "determination must be made upon the evidence that was presented to the Board at the hearing.” Bd. of Prof'l Responsibility v. Custis, 2015 WY 59, ¶ 19, 348 P.3d 823, 829 (Wyo. 2015) (citations omitted). As no party raised this issue either below or on appeal, and in fact both parties referred to the letter, it remains part of the record, particularly when Judge Neely waived confidentiality when she filed her motion to remove confidentiality. See infra ¶ 14.

. As we discuss below, see infra ¶ 57, this Court is not bound by the Commission’s recommendation, and although we have determined that discipline is appropriate, we stop short of removing her from either of her judicial positions.

. Although Congress subsequently attempted to overturn Smith by enacting the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 20000bb, the United States Supreme Court struck down the Act, as applied to state actions, in City of Boerne v. Flores, 521 U.S. 507, 536, 117 S.Ct. 2157, 2172, 138 L.Ed.2d 624 (1997).

. Most cases dealing with the tension between the First Amendment and restrictions on judicial conduct arise in the context of judicial election campaigns. See Winter v. Wolnitzek, 834 F.3d 681 (6th Cir. 2016); In re Judicial Campaign Complaint Against O'Toole, 141 Ohio St.3d 355, 24 *737 N.E.3d 1114 (2014). Judges in Wyoming are not elected, but rather are selected in a modified system of judicial selection known as "Merit Selection" or the "Missouri Plan.” “[T]he very practice of electing judges undermines" the interest in an impartial judiciary. Judges subject to regular elections "are likely to feel that they have at least some personal stake in the outcome of every publicized case.” And, because campaigns cost money, judges must engage in fundraising, which "may leave judges feeling indebted to certain parties or interest groups.” White, 536 U.S. at 788-90, 122 S.Ct. at 2542 (O’Connor, J„ concurring). "Legislative and executive officials act on behalf of the voters who placed them in office; judge[s] represent[t] the Law.” Id. at 803, 122 S.Ct. at 2550 (Ginsburg, J., dissenting) (internal quotation marks and citation omitted).

. "There cannot be one set of employees to serve the preferred couples and another who is 'willing' to serve LGBT citizens with a 'clear conscience'....” Barber v. Bryant, 193 F.Supp.3d 677, 711 (S.D. Miss. 2016).

. Her reference to Wyoming Constitution, Article 1, section 20 (free speech rights) contains no argument for why the Wyoming Constitution might provide greater free speech rights than does the First Amendment of the United States Constitution, and we will therefore not address that provision of the Wyoming Constitution separately.

. We have noted before that:
The debates of the convention are not a very reliable source of information upon the subject of the construction of any particular word or provision of the constitution. As we understand the current of authority, and the tendency of the courts, they may for some purpose, but in a limited degree, be consulted in determining the interpretation to be given some doubtful phrase or provision; but, as a rule, they are deemed an unsafe guide.
Powers v. State, 2014 WY 15, ¶ 39, 318 P.3d 300, 314 (Wyo. 2014), reh’g denied (Feb. 12, 2014) (quoting Rasmussen v. Baker, 7 Wyo. 117, 138, 50 P. 819, 824 (Wyo. 1897)).

. Alabama Constitution section 3 provides that "no religious test shall be required as a qualification to any office or public trust under this state.” Moore, 891 So.2d at 858 (citation omitted).

. The law recognizes no hierarchy of sincerely held religious beliefs. " ‘[Rleligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.' ” Church of the Lukumi Babalu, 508 U.S. at 531, 113 S.Ct. at 2225 (quoting Thomas v. Review Bd. of Indiana Employment Security Div., 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981)). Yet if Judge Neely had taken the position that her religion prevented her from conducting interracial marriages, a right which our society now generally accepts, there would be little controversy regarding her discipline. While we respect the religious views of those who deem same-sex marriage to be wrong, we cannot give those views greater weight in our constitutional analysis simply because they are more widely held.
The idea of the Constitution "was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.” West Virginia Bd. of Ed. v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). This is why "fundamental rights may not be submitted to a vote; they depend on the outcome of no elections.” Ibid. It is of no moment whether advocates of same-sex marriage now enjoy or lack momentum in the democratic process.
Obergefell, 135 S.Ct. at 2605-06.

. It is, of course, possible to interpret the phrase "appearance of impropriety” much more broadly and to suggest that it embraces a situation where the facts are only partially known, and where this partial version of the facts might rouse legitimate suspicion. Suppose, for example, that it was known only that Judge Haynsworth had some stock in the litigant, without it being known how miniscule his interest was? But this interpretation would cut so broadly as to prevent a judge named Jones from presiding at the trial of a defendant named Jones, even though they were totally unrelated, since it would be possible from simply reading the docket entries to conclude that they were related to one another. It will not do.
Matter of Larsen, 532 Pa. 326, 616 A.2d 529, 583 (1992) (quoting Rehnquist, Sense and Nonsense About Judicial Ethics, 28 The Record 694, 701 (1973)) (emphasis in original).

. "Impartiality'' includes the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties...." "Impropriety” includes conduct "that undermines a judge’s independence, integrity, or impartiality.” Wyoming Code of Judicial Conduct, Terminology.

. "Bias” is "[a] mental inclination or tendency; prejudice; predilection.” Black’s Law Dictionary 192 (10th ed. 2014). "Prejudice” is "[a] preconceived judgment or opinion formed with little or no factual basis; a strong and unreasonable dislike or distrust.” Black’s Law Dictionary 1370 (10th ed. 2014).