# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 109

**OCTOBER TERM, A.D. 2021**

**October 12, 2021**

IN THE INTEREST OF ASM:

ASM,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

S-21-0026

*Appeal from the District Court of Albany County*
*The Honorable Tori R.A. Kricken, Judge*

*Representing Appellant:*
> Jennifer K. Stone of Schilling, Winn & Stone, P.C., Laramie, Wyoming.

*Representing Appellee:*
> Jennifer M. Curran, Deputy, Albany County Attorney & Prosecuting Attorney's Office, Laramie, Wyoming.

*Before FOX, C.J., and DAVIS, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

---

**NOTICE:** This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BOOMGAARDEN, Justice.**

[¶1]    The district court determined that ASM, a middle-aged woman, needed to be involuntarily hospitalized pursuant to Wyo. Stat. Ann. § 25-10-110 because she was mentally ill as defined under § 25-10-101(a).  On appeal ASM claims the court erred when it found her mentally ill.  She also claims the court violated her constitutional right to free exercise of religion.  We affirm.

### *ISSUES*

[¶2]    We rephrase the issues:

> I. Did the district court err when it found ASM mentally ill as defined under Wyo. Stat. Ann. § 25-10-101(a)?

> II. Did the district court deny ASM her constitutional right to free exercise of religion?

### *FACTS*

[¶3]    ASM began injuring herself in October 2020, while she was detained at the Albany County Detention Center on arson charges.

[¶4]    On October 13, the Albany County & Prosecuting Attorney applied for emergency detention of ASM under Wyo. Stat. Ann. § 25-10-109.  The county attorney attached two documents to the application.  In the first, an "Emergency Detention Crisis Assessment Form," a detention officer explained that ASM had been placed in the restraint chair at least 16 times in the last two weeks due to self-injury.  ASM had punched herself in the face and bashed her head against the wall to the point that she split her head open and her eyes had swollen shut.  She also scratched the skin off her face.  In the second, a psychiatric evaluation, Patrick W. Tufts, MD, reported that ASM was engaging in self-harm behaviors due to mental illness and needed a safe and stabilizing environment.  The district court promptly appointed ASM counsel and held a hearing the next day.

[¶5]    Following that hearing, the court found by a preponderance of the evidence that ASM was mentally ill.  It ordered that she be detained at Ivinson Memorial Hospital – Behavioral Health Services (BHS) for a period not to exceed 10 days, where she could be prescribed and administered psychotropic medications to stabilize her mental health.

[¶6]    Before the 10-day period expired, the county attorney requested a hearing to determine whether ASM needed to be involuntarily hospitalized pursuant to § 25-10-110.  In accordance with § 25-10-110(e), the court ordered Joseph Schaaf, MD, and Tina Nirk, MS, LCP, to examine ASM.  They provided a written report of their findings on her history

1

and mental illness.[1]  A district court commissioner held a hearing on October 23, where Dr. Schaaf and ASM testified.  After receiving the commissioner's recommendation, the district court found by clear and convincing evidence that ASM was mentally ill and ordered that she be hospitalized at the Wyoming State Hospital.

[¶7]    We discuss the facts in more detail as relevant to our analysis.

## DISCUSSION

### I.    *The district court did not err when it found ASM mentally ill.*

[¶8]
> Title 25, Chapter 10 of the Wyoming statutes provides a procedure for the detention and hospitalization of a mentally ill individual, establishing a two-step hearing process in which a district court may first detain a proposed mentally ill individual if a preponderance of the evidence at an informal hearing shows that the person is mentally ill as that term is defined by the statute.  §§ 25-10-109, 101(a)(ix).  The statutes then provide for a more formal hearing on whether the patient should be involuntarily hospitalized.  At that hearing, a patient has the right to have the court (or a jury if one is timely requested) determine whether [s]he suffers from mental illness to the extent that [s]he is a danger to [herself] or others.  § 25-10-110(h), (j).

*State ex rel. W. Park Hosp. Dist. v. Skoric*, 2014 WY 41, ¶ 12, 321 P.3d 334, 339 (Wyo. 2014).

[¶9]    If, after the hearing and consideration of the record, the court or jury "finds by clear and convincing evidence that the proposed patient is mentally ill the court shall consider the least restrictive and most therapeutic alternatives," which may include hospitalization. Wyo. Stat. Ann. § 25-10-110(j) (LexisNexis 2021); *see also In re RB*, 2013 WY 15, ¶ 24, 294 P.3d 24, 31 (Wyo. 2013).  "Clear and convincing evidence is evidence that would persuade a finder of fact that the truth of the contention is highly probable." *Heimer v. Heimer*, 2021 WY 97, ¶ 15, 494 P.3d 472, 477 (Wyo. 2021) (citation omitted).

[¶10] The statutes define a person as "mentally ill" if she has "a physical, emotional, mental or behavioral disorder which causes [her] to be dangerous to [herself] or others and which requires treatment[.]"  Wyo. Stat. Ann. § 25-10-101(a)(ix) (LexisNexis 2021).  A person is deemed a danger to herself or others if, as a result of mental illness, she:

---

[1] Dr. Schaaf was a psychiatrist, and Ms. Nirk was a licensed clinician, at Ivinson Memorial Hospital.

(A) Evidences a substantial probability of physical harm to [herself] as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm; or

(B) Evidences a substantial probability of physical harm to other individuals as manifested by a recent overt homicidal act, attempt or threat or other violent act, attempt or threat which places others in reasonable fear of serious physical harm to them; or

(C) Evidences behavior manifested by recent acts or omissions that, due to mental illness, [s]he is unable to satisfy basic needs for nourishment, essential medical care, shelter or safety so that a substantial probability exists that death, serious physical injury, serious physical debilitation, serious mental debilitation, destabilization from lack of or refusal to take prescribed psychotropic medications for a diagnosed condition or serious physical disease will imminently ensue, unless the individual receives prompt and adequate treatment for this mental illness. No person, however, shall be deemed to be unable to satisfy [her] need for nourishment, essential medical care, shelter or safety if [s]he is able to satisfy those needs with the supervision and assistance of others who are willing and available[.]

Wyo. Stat. Ann. § 25-10-101(a)(ii)(A)–(C). "While this definition requires evidence of recent acts or omissions of endangerment, either to self or others, a court may consider a person's mental health history in determining whether directed outpatient commitment or involuntary hospitalization is warranted." Wyo. Stat. Ann. § 25-10-101(a)(ii)(D).

[¶11] The district court found by clear and convincing evidence that ASM was mentally ill under § 25-10-101(a)(ix) and posed a danger to herself under both (a)(ii)(A) and (C). ASM challenges the court's finding that she posed a danger to herself, suggesting no evidence supported a finding under either provision.

[¶12] We review the court's decision under our familiar bench trial standard of review:

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail

3

weighing disputed evidence. Findings of fact will not be set aside unless the findings are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. We review a district court's conclusions of law de novo on appeal.

*Denbury Onshore, LLC v. APMTG Helium LLC*, 2020 WY 146, ¶ 25, 476 P.3d 1098, 1105 (Wyo. 2020) (citation omitted). We affirm under (a)(ix) and (a)(ii)(A), examining each relevant part of those definitions in turn—specifically, (1) whether ASM had "a physical, emotional, mental or behavioral disorder"; (2) which caused her to be dangerous to herself in that she "[e]vidence[d] a substantial probability of physical harm to [herself] as manifested by evidence of recent threats of or attempts at . . . serious bodily harm"; and (3) "which require[d] treatment[.]"

## Physical, emotional, mental or behavioral disorder

[¶13] Dr. Schaaf's testimony and the written report support the district court's finding that ASM had "a physical, emotional, mental or behavioral disorder[.]" Wyo. Stat. Ann. § 25-10-101(a)(ix). Dr. Schaaf testified that ASM's "[p]rimary diagnosis [was] mixed personality disorder including features of schizotypal antisocial narcissism and borderline." Her "[s]econdary diagnosis [was] delusional disorder, grandiose type and following that would be potential bipolar disorder unspecified." The written report reflected similarly. ASM generally denied having a mental illness and confirmed that she had asked her counsel to obtain a second opinion about her diagnosis, but presented no other evidence to rebut Dr. Schaaf's diagnosis.

## Caused her to be dangerous to herself

[¶14] The "Emergency Detention Crisis Assessment Form," considered together with Dr. Schaaf's testimony at each hearing, supports the court's finding that ASM's disorder caused her to be a danger to herself. The form, dated October 13, 2020, detailed the extent to which ASM had been injuring herself in the detention facility in the weeks leading up to her transfer to BHS:

> In the last two weeks, [ASM] has been placed in the restraint "violent" chair at least 16 times due to self[-]injury. She punches herself in the face [and] head, bashes her head against the wall and scratches the skin off of her face. On 10.12.2020 @ 0700 [hours] when I reported for duty, inmate [ASM] was in the restraint chair inside the violent cell. She had been placed there at 0551 hours because deputies could not get her

4

to stop punching herself in the face and scratching the skin off
of her face.

[ASM] has punched herself in the face [and] bashed her head
into the wall to the point th[at] she has split her head open and
that her eyes have swollen shut.

The county attorney filed that form just 10 days prior to the involuntary hospitalization hearing, thus satisfying the "evidence of recent threats of or attempts at . . . serious bodily harm" requirement. Wyo. Stat. Ann. § 25-10-101(a)(ii)(A).

[¶15] In Dr. Schaaf's opinion ASM posed a danger to herself because of her behavior in the detention facility. He expressed concern that, if discharged from the hospital or jail setting, she would engage in self-mutilating type behavior. Dr. Schaaf also believed that ASM engaged in self-harm behaviors due to her personality disorder. Though ASM suggested otherwise, he did not believe anything in her medical history was contributing to or causing her mental illness or current conditions. Bell's Palsy could not explain why she was nonverbal/mute. Similarly, he did not see any correlation between ASM's claimed chemical injury and actions.

[¶16] Considered together, the foregoing evidence supports the court's conclusion that ASM's disorder "cause[d] [her] to be dangerous to [herself]" in that she "[e]vidence[d] a substantial probability of physical harm to [herself] as manifested by evidence of recent threats of or attempts at . . . serious bodily harm[.]" Wyo. Stat. Ann. § 25-10-101(a)(ix), (a)(ii)(A).

[¶17] ASM suggests that she no longer posed a danger to herself because Dr. Schaaf testified that her significant self-harm—particularly about the face—immediately stopped when she arrived at BHS. However, Dr. Schaaf offered an explanation for ASM's sudden change in behavior: she chose when to engage in self-harm; at some level, she engaged in self-harm to manipulate; and that manipulation was the product of her personality disorder. Consequently, viewing the entire evidence and giving due regard to the district court's assessment, we do not believe the court erred when it found ASM posed a danger to herself.

### Required treatment

[¶18] Dr. Schaaf's testimony supports the district court's finding that ASM's disorder required treatment. Wyo. Stat. Ann. § 25-10-101(a)(ix). He testified that ASM needed to remain on a mild dose of both an antipsychotic and a mood stabilizer; she also needed to participate in therapy. He wanted ASM to return to the detention facility, on condition that she remain at BHS for "another two or so days" to "A) engage in any therapy, which she often avoids; and B) to give any medications that are used, further chance to see if they're beneficial before returning to the detention facility where she would continue such

5

medications in hope that they would become beneficial." If she returned to the detention center, she needed to participate in an outpatient commitment program with a gatekeeper to ensure that she continued to take her medications or have them administered. When asked if ASM needed to go to the Wyoming State Hospital, Dr. Schaaf responded that until ASM made long-term improvement she needed "to remain in an institutional setting of some sort [or] she would quickly return to the behaviors and conditions that existed prior to her first admission here a few months ago." It would not be safe for her to be out in the community and she should not be afforded bond. ASM generally denied needing medication and did not want to engage in therapy, but the court had latitude to assess her testimony and weigh it against Dr. Schaaf's.

[¶19] In sum, on reviewing the entire evidence, including ASM's testimony, and giving due regard to the district court's role as fact finder, we are not left with the definite and firm conviction that the district court made a mistake when it found ASM mentally ill.

## II. The district court did not deny ASM her constitutional right to free exercise of religion.

[¶20] In her second issue, ASM contends the district court denied her constitutional right to free exercise of religion under both the United States and Wyoming constitutions when it ordered her involuntary hospitalization for engaging in what she characterized as the Catholic ritual of mortification.[2] We review ASM's constitutional claim de novo. *See, e.g.*, *Mahoney v. City of Gillette*, 2019 WY 28, ¶ 9, 436 P.3d 444, 448 (Wyo. 2019) ("Constitutional challenges present issues of law that we review *de novo*." (citation omitted)).

[¶21] The Free Exercise Clause of the First Amendment guarantees that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. This provision has been applied to the states through the Fourteenth Amendment. *Neely*, ¶ 16, 390 P.3d at 735 (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Id.* (quoting *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990)). "Yet the United States Supreme Court has recognized an important distinction between the 'freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be.'" *Id.* (quoting *Cantwell*, 310 U.S. at 303–04, 60 S.Ct. at 903).

---

[2] ASM's references to Wyoming Constitution, Article 1, section 18 (religious liberty) and Article 21, section 25 (religious liberty) contain no argument why the Wyoming Constitution might provide greater free exercise rights than the First Amendment to the United States Constitution. Therefore, we will not separately address those provisions of the Wyoming Constitution. *See In re Neely*, 2017 WY 25, ¶¶ 39–40, n.9, 390 P.3d 728, 741–42, n.9 (Wyo. 2017).

[¶22] The Free Exercise Clause prohibits the government from interfering with or attempting to regulate a person's religious beliefs, including "directly penalizing or discriminating against a person for holding beliefs contrary to those held by anyone else." 16A Am. Jur. 2d *Constitutional Law* § 435, Westlaw (database updated Aug. 2021) (footnote omitted).

[¶23] "To be protected under the Free Exercise Clause, a religious belief must be sincerely held, as viewed in the context of the individual's life as he or she now lives it. Thus, the sincerity of an avowed adherent of a particular religion may be judicially investigated." 16A C.J.S. *Constitutional Law* § 868 (footnotes omitted), Westlaw (database updated Aug. 2021); *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 2225–26, 124 L.Ed.2d 472 (1993) (noting that the Court had to consider petitioners' First Amendment claims because the city did not and could not "argue that Santeria is not a 'religion' within the meaning of the First Amendment" and neither the city nor the courts below "questioned the sincerity of petitioners' professed desire to conduct animal sacrifices for religious reasons"); *Frazee v. Illinois Dep't of Emp. Sec.*, 489 U.S. 829, 834, 109 S.Ct. 1514, 1517–18, 103 L.Ed.2d 914 (1989) (explaining that appellant was entitled to invoke First Amendment protection because his refusal to work on Sunday "was based on a sincerely held religious belief"); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1256–58, n.24 (11th Cir. 2012) (discussing the threshold requirement that the claimant sincerely hold a religious belief); *Neely*, ¶ 8, 390 P.3d at 733 (noting that it was undisputed that appellant, a devout Christian and member of the Lutheran Church, Missouri Synod, held a sincere belief that marriage is the union of one man and one woman).

[¶24] Although the record is underdeveloped for review we easily conclude that, even assuming ASM held a sincere religious belief in the Catholic ritual of mortification, she failed to establish that she was engaged in such practice when she injured herself in the detention facility.

[¶25] ASM presented limited evidence about her practice of mortification at either hearing. At the emergency detention hearing, ASM testified that she was an ordained Catholic nun and the scratches on her face were from mortification, which she asserted was legal and usually a private matter. ASM confirmed that she scratched her face while in the detention center. She acknowledged that it was "possible" that she struck herself in the face as part of the ritual.

[¶26] Her evidence was similarly limited at the involuntary hospitalization hearing. When asked if she had engaged in the ritual of mortification in jail, ASM answered: "I can talk to priests about it and ask whether I should do this." When asked whether she had engaged in self-harm, she declined to respond. ASM generally asserted that solitary confinement would be better for her monastic vows. She did not agree that she had been self-mutilating, claiming instead that she had engaged in the Catholic ritual of mortification.

[¶27] Dr. Schaaf offered an alternate, and more credible, explanation for ASM's behavior: "[t]he self[-]injury and harm to herself [was] likely a product of borderline personality disorder and conscious and unconscious attempts to gain attention." Dr. Schaaf was aware of ASM's religious beliefs but believed that she "engage[d] [in] and promote[d] religious beliefs as a way to manipulate others around her." He was also aware of some form of self-chastisement in Catholicism, but opined that it did not fit the way ASM chose to self-harm. He added that ASM "seamlessly alternate[d] between ideas of strict Catholicism and also Buddhism and many other . . . alternate religions[.]" Further, ASM's self-harming behaviors correlated with many occasions when she contacted police officers to report being assaulted when she had in fact been hitting herself. He explained that "at some level [ASM] engage[d] in self[-]harm behaviors not as a way to express herself in a spiritual sense but to again manipulate." That manipulation was due to her personality disorder.

## *CONCLUSION*

[¶28] The district court did not err in finding ASM mentally ill as defined under Wyo. Stat. Ann. § 25-10-101(a)(ix) and (a)(ii)(A), as she: had "a physical, emotional, mental or behavioral disorder"; which caused her to be dangerous to herself in that she "[e]vidence[d] a substantial probability of physical harm to [herself] as manifested by evidence of recent threats of or attempts at . . . serious bodily harm"; and which required treatment. Moreover, on reviewing the evidence of record, we conclude that, even assuming ASM held a sincere religious belief about the Catholic ritual of mortification, she failed to establish that she was engaged in such practice when she injured herself in the detention facility. Thus, the district court did not deny her constitutional right to free exercise of religion.

[¶29] Affirmed.